IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LOUIS KONYA,                          )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )   Civ. No. 04-902-SLR
                                      )
JO ANNE BARNHART,                     )
COMMISSIONER, SOCIAL SECURITY         )
ADMINISTRATION,                       )
                                      )
          Defendant.                  )

---

Karen Y. Vicks, Esquire.  Counsel for Plaintiff.

Colm F. Connolly, United States Attorney, Patricia C. Hannigan,
Assistant United States Attorney, and David F. Chermol, Special
Assistant United States Attorney, United States Attorney's
Office, Wilmington, Delaware.  Counsel for Defendant.  Of
Counsel: Donna L. Calvert, Regional Chief Counsel, Social
Security Administration, Philadelphia, Pennsylvania.

---

**MEMORANDUM OPINION**

Dated: September 27, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

## I.   INTRODUCTION

Plaintiff Louis F. Konya filed this action against defendant
Jo Anne B. Barnhart, Commissioner of Social Security, on July 27,
2004.  (D.I. 1)  Plaintiff seeks judicial review, pursuant to 42
U.S.C. § 405(g), of a decision by defendant denying his claim for
disability income benefits under §§ 216(I) and 223 of the Social
Security Act.  (Id.; D.I. 4 at 16)  Currently before the court is
defendant's motion for summary judgment.  (D.I. 8)  For the
reasons that follow, defendant's motion for summary judgment is
granted in part and denied in part, and the case is remanded to
the Commissioner for further proceedings.

## II.   BACKGROUND

### A.   Procedural Background

On February 21, 2002, plaintiff filed an application for
disability insurance benefits and supplemental security income
due to a heart condition, hypertension, gout, arthritis, and the
side effects of medication.  (D.I. 4 at 80)  Plaintiff claimed
that he became unable to work beginning on July 24, 2001 due to
heart disease, gout, arthritis, angina, lack of energy, easy
fatigue, lack of concentration, and dizziness.  (Id. at 80, 91,
116-126)  The claim was denied because it was determined not to
be severe enough to keep plaintiff from working.  (Id. at 59)
Plaintiff requested that he receive a hearing before an

administrative law judge ("ALJ").  (<u>Id.</u> at 63)  The hearing was

held on May 9, 2003.  (D.I. 4 at 36-75)  On October 8, 2003, the

ALJ denied plaintiff's claim.  (<u>Id.</u> at 24)  The ALJ found the

following:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through December 31, 2006.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant's cardiac condition is a severe impairment, based upon the requirements in the Regulations (20 CFR § 404.1521).

4.   This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7.   The claimant has the following residual functional capacity: he can lift and carry up to 10 pounds at a time and lesser amounts frequently; push and pull within limits; sit and stand at least two hours per workday; and sit for six hours per workday.  He can occasionally climb stairs, balance, kneel, crouch, crawl, and stoop.  He should avoid temperature extremes, noise, humidity, wetness, and high stress situations.

8.   The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9.   The claimant is a "younger individual" (20 CFR § 404.1563).

10.  The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

11.  The claimant has no transferable skills from any past relevant work and/or transferability of

2

skills is not an issue in this case (20 CFR §
404.1568).

12. The claimant has the residual functional capacity
to perform the full range of sedentary work (20
CFR § 416.1567).

13. Based on an exertional capacity for sedentary
work, and the claimant's age, education, and work
experience, a finding of "not disabled" is
directed by Medical-Vocational Rule 201.28.

14. The claimant was not under a "disability," as
defined in the Social Security Act, at any time
through the date of the decision (20 CFR §
404.1520(f)).

(<u>Id.</u> at 22-23)  On June 15, 2004, the Appeals Council declined to

review the ALJ's decision and her decision became the final

decision of the Commissioner.  (D.I. 4 at 5-7, 13-24)

**B.   Facts Evinced At The Administrative Hearing**

According to his testimony at the hearing, plaintiff was

born on May 23, 1961, and is single with no children.  (<u>Id.</u> at

41, 47-48)  Plaintiff has a B.S. in Environmental Technology and

his past employment included work as a waste lead operator for

Hatfield Task Municipal Authority, and as a lab technician and

chemist tech for two other waste treatment plants.  (<u>Id.</u> at 39,

41)

Plaintiff alleges that he suffers from several disabling

medical problems, including: heart disease, high blood pressure,

angina, gout, arthritis, and many side effects from medication

for these conditions.  (<u>Id.</u> at 42)  Plaintiff states that due to

these problems, he is unable to do any strenuous activity, is

sensitive to sunlight, and suffers from a lack of energy.  (<u>Id.</u>

3

at 45)  Plaintiff testified that he had two heart attacks, one in
1995 and another in 2000.  (D.I. 4 at 42)  Plaintiff further
stated that he has nine stents in his heart.  (Id. at 43)  As a
result of a July 2001 cardiac procedure and resulting therapy, he
was unable to return to work.  (Id. at 40-41)  Plaintiff alleges
that he was forced to resign or be fired from the Hatfield Task
Municipal Authority in July 2002 because "there was a lot of
stairs and a lot of heavy lifting" and he was unable to perform
his duties.  (Id. at 39-40)

   Plaintiff notes that he takes the following medications:
Toprol-XL, Zestoretic (Zestril), Zocor, aspirin, Probenazine
Coltrozine, and Indomethacin.  (D.I. 4 at 43-44)  Plaintiff
states that he had formerly been taking blood thinner, "Nitro"
[nitroglycerine], and Plavix.  (Id. at 44-45)  According to
plaintiff, he presently has gout symptoms, including a swollen
left knee and ankle.  (Id. at 44)  He explains that his gout
symptoms affect what he can do during the day, such as preventing
him from straightening his leg.  (Id. at 51)  Plaintiff states
that he was last hospitalized on February 6, 2003 as a result of
chest pains.  (Id. at 44)  Plaintiff states that as a result of
arthritis, he has trouble sitting in one position for very long.
(D.I. 4 at 46)  When asked if he would have any problems in a job
where he would have to sit down for most of the day, plaintiff
responded that he would "seem to get back cramps" in such a job,

4

and that he would be unlikely to get such a job based on his job skills and experience.  (<u>Id.</u> at 52)  Plaintiff also suggested that he "might miss a lot of days" due to gout and angina attacks and the blurry vision he gets from his angina medications.  (<u>Id.</u>) Plaintiff further explained that in the past, his gout and arthritis would cause him trouble with turning his neck, and his angina medication caused bad headaches, such that his job performance was affected and he would "just go through the motions" while other workers covered for him.  (<u>Id.</u> at 53-54)

Plaintiff lives with his mother in her house and partakes in some household chores, including pressure washing the house and sidewalk, doing laundry, running the vacuum, cleaning the house, going to the grocery store, and cooking.  (<u>Id.</u> at 48-49) Plaintiff states that he hasn't been "doing much of anything the past year."  (D.I. 4 at 47)  He occupies his time by watching television and fishing from a shore.  (<u>Id.</u> at 48)  Plaintiff also notes that he has a dog which he walks about twice a week.  (<u>Id.</u> at 51)  When asked if there were any groups with whom he socializes, plaintiff stated that he knows some people, but that he has not made many friends, as he usually stays at home and his neighbors are elderly.  (<u>Id.</u> at 48)

### C.  Vocational Evidence

During the administrative hearing, the ALJ called Beth Kelley ("Ms. Kelley"), a vocational expert, to testify about

5

plaintiff's particular skills and the skill requirements
necessary for plaintiff's prior jobs.  (D.I. 4 at 54)  Ms. Kelley
testified that plaintiff's position as a treatment plant operator
is classified as "skilled" and "light" work, although plaintiff's
description in his work history for that position showed that the
work required exertion up to the "heavy" level.  (Id. at 54-55)
As Ms. Kelley explained, plaintiff's job as a chemist technician
is also classified as "skilled" and "light," although plaintiff
describes the work as falling in the "medium" exertion level.
Ms. Kelley stated that the skills plaintiff acquired in these
jobs are not transferable to "sedentary" jobs.  (Id. at 55)  Ms.
Kelley, when asked what types of employment plaintiff would be
able to perform, noted that "being rather incapacitated
approximately once a month for three to five days at a time, he
would be missing too much work to sustain regular or normal
employment."  (Id. at 55)

### D.   Medical Evidence

Medical records disclose that plaintiff had an
echocardiogram performed in November 1993 at Quakertown Hospital
which demonstrated diastolic dysfunction, including left
ventricular dysfunction.  (D.I. 4 at 161)  On November 10, 1995,
plaintiff visited Dr. Paul Marion and complained of mid-chest
discomfort while exercising on three occasions in the past few
weeks, but he continued to perform strenuous exercise despite the

presence of pain.  (Id.)  Plaintiff was admitted to Doylestown
Hospital that day for unstable angina after an EKG demonstrated
"diffuse T wave inversions anteriorly, suggestive of ischemia."
(Id.)  Upon diagnostic catherization on November 13, 1995,
plaintiff was found to have narrowing of the proximal left
anterior descending coronary artery, mild disease of the left
coronary artery, and mild hypokinesia of the anterior wall.
(Id.)  Plaintiff's November 14, 1995 discharge summary noted that
he had no history of congenital heart failure, but he had a
personal history of hypertension and a significant family history
of coronary disease.  (Id.)

Plaintiff was admitted to Presbyterian Medical Center on
November 14, 1995, and two stents were implanted after a routine
angioplasty.  (D.I. 4 at 173)  The procedure was successful in
reducing the stenosis in the left anterior descending coronary
artery from 95% to 0%.  (Id. at 197)  An examination of
plaintiff's left ankle on November 16, 1995 showed "minimal
degenerative changes with no evidence of fracture or dislocation"
and no history of gout.  (Id. at 194)

On February 22, 1996, Dr. Jeffrey P. Gress wrote that he had
examined plaintiff and that plaintiff had returned to exercising
since his stent deployment, his hypertension was "under excellent
control" with the use of medication, his hyperlipidemia
medication was to be increased, and that plaintiff was expected

7

to do "quite well from a cardiovascular standpoint."  (Id. at
198)

Medical records reveal that plaintiff was involved in an
April 8, 1995 motor vehicle accident and, in January of 1998, he
told Dr. J. Dale Howe that he had had intermittent lower back
pain for the past three years but could lift 50 pounds without
difficulty.  (Id. at 199)  Dr. Howe wrote in July of 1998 that
plaintiff's ongoing aches and pains appeared to be a result of
his automobile accident.  (D.I. 4 at 200)  Dr. Howe also noted
that plaintiff had degenerative mild disc herniation problems
which were likely due to the accident, but that there was no sign
of any nerve impingement.  (Id.)  No restrictions were placed on
plaintiff by Dr. Howe, who noted that "the prognosis is good . .
. there was no serious impairment of body function or permanent
serious disfigurement which occurred to this patient."  (Id.)  As
Dr. Howe continued, "The ongoing aches and pains I would rate at
approximately 15% impairment of function which at this point I
would rate as permanent.  This means that the aches and pains are
in the subjective area, and no objective finds [sic] of
impairment can be identified."  (Id. at 200)

After presenting to the emergency room with recurrent chest
pain, plaintiff was admitted to Lehigh Valley Hospital on August
15, 2000.  (D.I. 4 at 217, 219)  On August 17, 2000, plaintiff
underwent cardiac catherization, which revealed a 99% stenosis of

8

the right coronary artery, a 80-85% stenosis of the circumflex, no obstruction of the stented left anterior descending coronary artery, and no obstruction of the main stem. (Id. at 217)  On August 18, 2000, catheter-based intervention was performed on the right coronary artery and the obtuse marginal, circumflex proper and ramus intermedius branches, with an "excellent angiographic result" and plaintiff tolerating the procedure well. (Id. at 218, 222)  Plaintiff underwent angioplasty and intracoronary stenting, with four stents being placed in the right coronary artery and one stent in each of the marginal and circumflex branches. (Id. at 222)  Plaintiff was subsequently discharged from Lehigh Valley Hospital on August 19, 2000.  (Id.)

Plaintiff underwent an exercise stress test on September 14, 2000, which revealed no production of anginal type symptoms and no changes on the cardiogram meeting the criteria for ischemia. (D.I. 4 at 265)  Plaintiff also had an exercise test and MIBI (myocardial perfusion) scan that day which revealed "mild left ventricular cavity enlargement" but "normal left ventricular function" with no ischemia present. (Id. at 268)  On September 22, 2000, Dr. Bryan W. Kluck noted that plaintiff's thallium scan that day showed "no evidence of coronary ischemia and good left ventricular function." (Id. at 264)  Dr. Kluck concluded, "Mr. Konya is doing well from an overall clinical point of view.  He has seemingly recovered from his rather complex multi stent

9

catheter-based therapeutic procedure." (<u>Id.</u> at 264)

On June 26, 2001, plaintiff underwent exercise testing and an MIBI scan which revealed evidence of a mild degree of exercise-induced myocardial ischemia. (<u>Id.</u> at 248) On the same day, an exercise stress test revealed no arrhythmias, but "systolic hypertension with exercise" and "blunted heart rate response due to medication effect." (D.I. 4 at 249) On July 16, 2001, Dr. Kluck examined plaintiff and noted that he had recently experienced increased chest discomfort. (<u>Id.</u> at 263) Since there was also some evidence of myocardial ischemia, Dr. Kluck arranged for a repeat cardiac catheterization of plaintiff. (<u>Id.</u>)

On July 20, 2001, plaintiff was admitted to Lehigh Valley Hospital for unstable angina and a cardiac catheterization was performed. (D.I. 4 at 286) The procedure showed normal left ventricular function and that the left main coronary artery was unobstructed. (<u>Id.</u> at 287, 291) The left anterior descending coronary artery displayed some irregularities, but "no hemodynamically significant stenosis." (<u>Id.</u>) The ramus intermedius had an 80% stenosis at one portion. (<u>Id.</u>) The circumflex proper and marginal circumflex, both previously stented, were each unobstructed. (<u>Id.</u>) The right coronary artery, previously stented in two places, was unobstructed at the proximal stent, but had a "long 99% complex in-stent restenosis"

10

at the distal-most stent. (D.I. 4 at 287, 291)  Plaintiff was
discharged on July 20, 2001, with scheduled readmission on July
26, 2001 for "brachytherapy augmented catheter-based
intervention." (Id. at 288)  Plaintiff's discharge instructions
advised him not to lift or move more than 10 pounds for three to
five days and not to drive for 48 hours. (Id. at 289)  Plaintiff
was given a prescription for nitroglycerine and a fasting lipid
profile. (Id. at 287)  Plaintiff was also placed on a no-added-
salt, low-cholesterol diet and was instructed to remain at home
and not return to work. (Id. at 288)

     Plaintiff was readmitted on July 26, 2001 for "complex
repeat PTCA [percutaneous transluminal coronary angioplasty],
intracoronary stent, and brachytherapy of the right coronary
artery." (Id. at 293)  A new stent was implanted in the proximal
right coronary artery and brachytherapy was performed at the
sites of several of the previously implanted stents. (Id.)  Dr.
Kluck deemed the procedure successful and concluded that
"stenoses of 99%, 99%, 80% reduced to -10%, 0%, -10%,
respectively." (Id. at 297)  Plaintiff was discharged on July
27, 2001 and given prescriptions for nitroglycerin and a one-year
course of Plavix. (Id. at 294)  In addition, plaintiff was
restricted to a no-added-salt, low-cholesterol diet and his
activity was to be one of "gradual increase" with no lifting or
moving more than 10 pounds for 3-5 days and no driving for 48

11

hours.  (Id. at 294, 299)

On August 30, 2001, Dr. Kluck examined plaintiff and noted
that he had minimal symptoms since his reangioplasty and
brachytherapy of his right coronary artery.  (D.I. 4 at 246)  An
EKG performed that day revealed that plaintiff's heart had a
normal sinus rhythm.  (Id.)  Dr. Michael A. Rossi conducted a
MIBI scan and exercise test of plaintiff on September 6, 2001,
and noted findings consistent with "mild exercise induced
anterior wall ischemia."  (Id. at 231)  An exercise stress test
on the same day revealed an "appropriate blood pressure response
to exercise with heart rate blunted due to beta blockers."  (Id.
at 233)  On September 17, 2001, Dr. Kluck, noting that the
September 6 thallium test showed an absence of ischemia "in the
inferior distribution," wrote, "Reviewing his thallium studies in
the past, he has had a small anterior ischemic area.
Angiographically, there does not appear to be a source of the
ischemia.  I believe this is an area of repetitive false positive
findings . . . Based on both Louis's symptoms and his thallium
results, I believe he is in good shape.  I have given him the
okay to return to work and to resume full physical activity."
(Id. at 230)

On September 24, 2001, plaintiff began cardiac
rehabilitation therapy at the Lehigh Valley Hospital with the
goals of improving endurance, losing weight and establishing an

12

exercise routine.  (D.I. 4 at 313)  On September 26, 2001, Dr.
Ric Baxter, plaintiff's long-time primary care physician, wrote
that plaintiff "continues to have active angina pectoris and
remains at risk for a heart attack.  While is in continuing
medical therapy, he remains at risk.  Psychoemotional stress . .
. would certainly be a potentially adverse factor by increasing
heart rate and increasing ischemia – increasing the risk of heart
attacks."  (D.I. 4 at 145)

On December 3, 2001, Dr. Baxter wrote that plaintiff
"continues to have moderate hypertension and chest pain with
heavy exertion consistent with Angina Pectoris . . . I have
recommended **no work** at present and that he restart cardiac
rehab."  (Id. at 143, emphasis in original)  On December 4, 2001,
plaintiff went to Lehigh Valley Hospital after reporting symptoms
of chest pain, shortness of breath and lightheadedness after
playing basketball.  (Id. at 323)  Plaintiff was admitted for a
thallium treadmill test to rule out myocardial infarction.  (Id.
at 324)  A thallium stress test administered on December 6, 2001
was interpreted as negative and showed no signs of ischemia.
(Id. at 229, 326, 329, 335, 350)  Plaintiff was discharged in
stable condition on December 6, 2001, after reporting no further
episodes of chest pain.  (D.I. 4 at 335)  On January 11, 2002,
plaintiff completed phase 2 of his cardiac rehabilitation at
Lehigh Valley Hospital, with "good progress in his exercise

tolerance." (Id. at 313)

Dr. Kluck wrote on January 22, 2002 that plaintiff continues to experience "'sticking' chest discomfort consistent with his non-cardiac chest pain." (Id. at 229)  Dr. Kluck also noted at that time that he was making no changes to plaintiff's medical regimen of Zocor, Toprol, Zestoretic, Plavix and Cochicine. (Id.)  A thallium stress test in March of 2002 was performed to 12.9 METS[1] and was negative for ischemia, showing only evidence of a prior infarction. (D.I. 4 at 338, 339, 345)  A MIBI scan and exercise test on March 27, 2002 revealed evidence of prior myocardial infarction "without evidence of exercise induced myocardial ischemia" and normal resting left ventricular function. (Id. at 338)  An exercise stress test on the same day revealed "no major arrhythmias," but a "blunted hemodynamic response secondary to medication effect." (Id. at 339)  At an April 3, 2002 appointment, Dr. Kluck observed that plaintiff had "no real chest discomfort" and "basically no complaints of a cardiac nature." (Id. at 337)  Dr. Kluck noted the absence of any ischemia and stated that restenosis of the stents was no longer a concern, but stated that plaintiff was to remain on Plavix "for the remainder of the year since the procedure."

---

[1]A "MET" is "the oxygen cost of energy expenditure measured at supine rest (1 MET = 3.5 ml $O_2$ per kg of body weight per minute); multiples of MET are used to estimate the oxygen cost of activity, e.g., 3-5 METS for light work; more than 9 METS for heavy work." Stedman's Medical Dictionary 613 (27th ed. 2000).

(D.I. 4 at 337).  Stating that Plavix is "frightfully expensive,"
Dr. Kluck arranged for plaintiff to obtain the drug for the
remainder of the year.  (Id.)

     In April of 2002, a state agency physician, Dr. Oliver
Finch, reviewed the medical and other evidence while assessing
plaintiff's condition.  He concluded that plaintiff remained
capable of a range of medium work activity.  (Id. at 351-358)  As
an environmental limitation, Dr. Finch recommended that plaintiff
avoid concentrated exposure to extreme cold.  (Id. at 355)

     Medical records dated January 30, 2003 reveal that plaintiff
was involved in an automobile accident on January 24, 2003.
(D.I. 4 at 365)  Plaintiff complained of numbness in his left
thumb and index finger; knee and neck pain; non-severe pain in
his lower back; and pain in both shoulders.  (Id.)  Plaintiff was
prescribed Motrin for pain and no restriction was placed on his
activities apart from avoiding lifting heavy objects.  (Id. at
366)  Progress notes from March 13, 2003 reflect that plaintiff
continued to complain of neck stiffness and discomfort, but was
controlling his pain effectively with Motrin.  (Id. at 363)
Plaintiff also complained of numbness without weakness in his
left thumb.  (Id.)  It was recommended that plaintiff continue
taking Motrin, pursue physical therapy for his neck and avoid
heavy overuse of his neck.  (D.I. 4 at 364)  Medical records show
that plaintiff underwent physical therapy as a result of his

automobile accident and was taking Motrin for his pain, but
continued to complain of pain in his shoulders as late as April
25, 2003.  (Id. at 361, 367)  Physical examination on that day
revealed tenderness over both trapezius muscles.  (Id. at 362)

Plaintiff was admitted to Beebe Medical Center for chest
pain and "unstable angina" on February 6, 2003.  (Id. at 371-377)
At that time, the most recent exercise stress test in the medical
records was performed and showed a normal functional capacity and
appropriate response to exercise, according to Dr. Georges Dahr.
(D.I. 4 at 373)  A Cardiolite stress test was also administered
by Dr. Dahr, and his impression was that the test revealed: (1)
moderate size inferior wall myocardial infarction; (2) no
ischemia; (3) moderate left ventricle dilation; and (4) left
ventricular ejection fraction of 45%.  (Id. at 373-375)

The ALJ sent the medical evidence to Brad Rothkopf, M.D.,
for evaluation and his expert opinion.  (Id. at 378-380)  Dr.
Rothkopf noted that the medical evidence indicated that
plaintiff's impairments included: (1) coronary artery disease,
status-post myocardial infarction, status-post percutaneous
interventions involving angioplasties, stent placement and
brachytherapy; (2) hypertension; and (3) gout.  (Id. at 378)  He
concluded that plaintiff's impairments established by the medical
evidence did not meet or equal any impairment in the listing of
impairments at that time.  (D.I. 4 at 378)  Dr. Rothkopf noted

16

that on multiple occasions in the past, plaintiff met or equaled
one of the cardiac listing of impairments. (Id.)  However, since
"an intervention occurred reducing the severity of the stenosis
to less than 70%," Dr. Rothkopf stated that the listing was no
longer met or equaled and that he could find no period of one
year in which plaintiff continuously met the listings.  (Id.)
Dr. Rothkopf concluded that plaintiff possessed a capacity for a
range of sedentary work.  (Id. at 384-387)  Dr. Rothkopf noted
that plaintiff has "both recurrent and progressive disease" and
that, while the major epicardial arteries are open (but not
disease free), there are other vessels which have narrowed or
closed which could cause angina.  (Id. at 380)  Ultimately, Dr.
Rothkopf recommended for plaintiff a sedentary job in a temperate
environment that did not involve a high degree of stress.  (D.I.
4 at 387).

**III.  STANDARD OF REVIEW**

     "The findings of the Commissioner of Social Security as to
any fact, if supported by substantial evidence, [are]
conclusive," and the court will set aside the Commissioner's
denial of plaintiff's claim only if it is "unsupported by
substantial evidence."  42 U.S.C. § 405(g) (2002); 5 U.S.C. §
706(2)(E) (1999); see Monsour Med. Ctr. v. Heckler, 806 F.2d
1185, 1190 (3d Cir. 1986).  As the Supreme Court has held,

     "[s]ubstantial evidence is more than a mere scintilla.
     It means such relevant evidence as a reasonable mind

17

might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established . . . . It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting

NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300

(1939)).

The Supreme Court also has embraced this standard as the

appropriate standard for determining the availability of summary

judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
> Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)

(internal citations omitted). Thus, in the context of judicial

review under § 405(g),

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence — particularly certain types of evidence (e.g., that offered by treating physicians) — or if it really constitutes not evidence

18

but mere conclusion.

Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting

Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).  Where, for

example, the countervailing evidence consists primarily of the

claimant's subjective complaints of disabling pain, the

Commissioner "must consider the subjective pain and specify his

reasons for rejecting these claims and support his conclusion

with medical evidence in the record."  Mattel v. Bowen, 926 F.2d

240, 245 (3d Cir. 1990).

IV. DISCUSSION

   A.   Disability Determination Process

      Title II of the Social Security Act, 42 U.S.C. §

423(a)(1)(D), as amended, "provides for the payment of insurance

benefits to persons who have contributed to the program and who

suffer from a physical or mental disability."  Bowen v. Yuckert,

482 U.S. 137, 140 (1987).  A disability is defined as the

"inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not

less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A) (2002).

      In Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999), the Third

Circuit outlined the applicable statutory and regulatory process

for determining whether a disability exists:

19

In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."   A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability.  In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.  In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work.

If the claimant is unable to resume her former occupation, the evaluation moves to the final step.  At this stage, the burden of production shifts to the Commissioner, who must

20

> demonstrate the claimant is capable of performing
> other available work in order to deny a claim of
> disability.  The ALJ must show there are other
> jobs existing in significant numbers in the
> national economy which the claimant can perform,
> consistent with her medical impairments, age,
> education, past work experience, and residual
> functional capacity.  The ALJ must analyze the
> cumulative effect of all the claimant's
> impairments in determining whether she is capable
> of performing work and is not disabled.  The ALJ
> will often seek the assistance of a vocational
> expert at this fifth step.

Id. at 427-28 (internal citations omitted).  The determination

whether a claimant can perform other work may be based on the

administrative rulemaking tables provided in the Department of

Health and Human Services Regulations ("the grids").  See Jesurum

v. Sec'y of Health & Human Servs., 48 F.3d 114, 117 (3d Cir.

1995) (citing Heckler v. Campbell, 461 U.S. 458, 468-70 (1983)).

The grids require the ALJ to take into consideration the

claimant's age, educational level, previous work experience, and

residual functional capacity.  See 20 C.F.R. §404, subst. P, app.

2 (1999).  If the claimant suffers from significant nonexertional

limitations, such as pain or psychological difficulties,[2] the ALJ

---

[2]The regulations list the following examples of
nonexertional limitations:
> (i) You have difficulty functioning
> because you are nervous, anxious, or
> depressed;
> (ii) You have difficulty maintaining
> attention or concentrating;
> (iii) You have difficulty understanding
> or remembering detailed instructions;
> (iv) You have difficulty in seeing or
> hearing;

must determine, based on the evidence in the record, whether these nonexertional limitations further limit the claimant's ability to work. See 20 C.F.R. § 404.1569a(c)-(d). If they do not, the grids may still be used. If, however, the claimant's nonexertional limitations are substantial, the ALJ must use the grids as a "framework" only. See 20 C.F.R. § 404, subst. P, app. 2, § 200(d)-(e). In such a case, or if a claimant's condition does not match the definition provided in the grids, determination of whether the claimant can work is ordinarily made with the assistance of a vocational specialist. See Santise v. Schweiker, 676 F.2d 925, 935 (3d Cir. 1982). If the Commissioner finds that a claimant is disabled or not disabled at any point in the five-step sequence, review does not proceed to the next step. See 20 C.F.R. § 404.1520(a) (2002).

**B.   Application of the Five Step Test**

In the case at bar, the first and second steps of the five-part test to determine whether a person is disabled are not at issue:  (1) plaintiff is not currently engaged in substantial gainful activity; and (2) he suffers from a severe impairment.

---

(v)  You have difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or
(vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.
20 C.F.R. § 404.1569a(c).

22

Step three is in contention as plaintiff claims to suffer from an
impairment presumed severe enough to preclude any gainful work.
Since the ALJ found otherwise, she moved to step four and found
that plaintiff is unable to perform his past relevant work
because it exceeds his residual functional capacity.  Plaintiff
agrees with this conclusion.  However, the other issue in this
case concerns the fifth step:  whether or not plaintiff can
perform other work existing in the national economy.  See Mason
v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

The ALJ found that plaintiff has the residual functional
capacity to perform the full range of sedentary work and, based
on plaintiff's exertional capacity for sedentary work, his age,
education, and work experience, a finding of "not disabled" was
directed by Medical-Vocational Rule 201.28.  (D.I. 4 at 23)  See
20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.28 (2004).  The ALJ
noted that plaintiff has the following residual functional
capacity: he can lift and carry up to 10 pounds at a single time
and lift and carry lesser amounts frequently; push and pull
"within limits"; sit and stand at least two hours each workday;
and sit for six hours each workday.  (D.I. 4 at 23)  In addition,
the ALJ found that plaintiff can "occasionally climb stairs,
balance, kneel, crouch, crawl, and stoop."  (Id.)  In terms of
environmental limitations, the ALJ acknowledged that plaintiff
should avoid temperature extremes, noise, humidity, wetness, and

23

high stress situations.  (<u>Id.</u>)  Based on her finding that
plaintiff's exertional residual functional capacity to perform
substantially all of the strength demands required by work at the
sedentary level, the ALJ concluded that plaintiff was "not
disabled."  (Id. at 22)

Plaintiff challenges the ALJ's findings in three areas.  As
his first argument, plaintiff asserts that the ALJ erred in
failing to properly evaluate his subjective complaints.  He
claims that the ALJ failed to consider all of the regulatory
factors as required.  In addition, plaintiff maintains that the
ALJ's finding that the record fails to support plaintiff's
complaints of the side effects of his medications is not based on
substantial evidence.  As the final assertion of this first
argument, plaintiff claims that the ALJ's finding as to his
credibility is not based on substantial evidence.

As a second contention, plaintiff asserts that the ALJ
committed error by first, failing to properly consider Dr.
Baxter's opinion that plaintiff should not work and, then, by
failing to provide reasons for rejecting the opinion as required.

Finally, plaintiff asserts that the ALJ erred in finding
that plaintiff has no nonexertional limitations and in
mechanically applying the Medical-Vocational Guidelines.  As part
of this argument, plaintiff contends that defendant failed to
sustain her burden of establishing that there is other work in

24

the national economy which plaintiff can perform.  Plaintiff urges remand of the case and points to the need for vocational expert testimony based on the ALJ's own findings.

For the court to set aside defendant's conclusion that plaintiff was not under a "disability" as defined by the Social Security Act and to deny the pending motion for summary judgment, plaintiff must show that the ALJ's findings are not supported by substantial evidence.  The court, therefore, recognizes that defendant's decision is entitled to substantial deference.  The court, however, finds that the ALJ's decision is not substantially supported by the evidence and that it is appropriate to remand the case for further proceedings.

### C.   Plaintiff's Subjective Complaints

Pursuant to the regulations, the ALJ must consider the extent to which plaintiff's alleged symptoms can reasonably be accepted as consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529, 416.929 (2003).

With respect to claims of joint pain, the ALJ noted that plaintiff has claimed to suffer from "gouty arthritis" and problems with his neck, shoulders and back.  (D.I. 4 at 18)  The ALJ pointed out that there is little evidence corroborating these claims: (1) Dr. Howe noted some degenerative changes in plaintiff's back, but expressly imposed no restrictions on him; (2) there were no relevant observations taken to support

25

plaintiff's claims of knee and ankle pain; (3) multiple stress treadmill tests have been taken since 2001 and no orthopedic problems have been alleged; (4) after plaintiff's automobile accident in early 2003, Dr. Damouni found evidence of osteoarthritis in plaintiff's back, but plaintiff was found to have full range of motion of his spine and normal motor power and sensation; and (5) plaintiff reported reduced pain in his neck, back, and knees since the accident, with Dr. Damouni finding that normal sensation had returned to his thumb.  (Id.)  Finally, after considering testimony by plaintiff that he had been suffering from arthritis and had been having recent gout attacks every three to five days without much relief from medication, the ALJ concluded that the evidence showed plaintiff had "no musculoskeletal problems which have lasted or could be expected to last at least twelve continuous months."  (Id.)  As presented, the ALJ's findings are supported by substantial evidence.

Plaintiff also asserted that he suffered from side effects from his medications, such as anergia, fatigue, loss of concentration, dizziness, blurred vision, insomnia, easy bruising, headaches, and sensitivity to sunlight.  (D.I. 4 at 19) The ALJ noted that these symptoms had not been mentioned to medical personnel, including the prescribing physicians, so no credence could be lent to those assertions.  (Id.)

Plaintiff has cited several documents in the medical records

which reflect his complaints of dizziness, fatigue, and blurred

vision.  (D.I. 6; citing D.I. 4 at 139, 140, 148, 150, 233, 249,

323, 339, 380)  However, it is unclear that these complaints stem

from the side effects of plaintiff's medications; no objective

evidence was offered to suggest a reduction in capacity to work

due to these complaints.  In addition, the medical evidence

reflects the limited severity of the side effects which have been

linked to the use of plaintiff's medications.  For example, the

"physiologic response" of plaintiff to an exercise stress test

conducted on March 27, 2002 was described as "slightly blunted

due to medication effect."  (D.I. 4 at 229)  The evaluation of

plaintiff by Dr. Rothkopf, the medical expert upon whom the ALJ

relied, noted only that "fatigue **may be** related to medication."

(Id. at 380, emphasis added)  While it may be difficult, if not

impossible, for medical experts to definitively conclude that a

particular symptom is the side effect of a medication, this

obstacle does not sufficiently explain why, if a side effect were

suspected, plaintiff was not switched from a troublesome

medication.[3]  There are numerous accounts of complaints of pain

---

[3]There is only one reference cited by plaintiff as to a
change in his medications; in 2001, Plavix was stopped "after
episode of hemoptysis." (D.I. 4 at 144)  Dr. Kluck resumed
plaintiff on Plavix in April 2002. (Id. at 337)  Plaintiff cites
this incident as evidence that simply because his doctors did not
change his medications does not mean that he suffered from no
side effects from taking the medications. (D.I. 11 at 7)
Plaintiff contends that there may not be any substitute
medications that are appropriate for a specific medical condition

and diagnoses of hypertension, angina, gout, arthritis, and
ischemia, but no medical evidence of side effects of medication
so significant as to be debilitating.  Therefore, the ALJ's
conclusion that plaintiff's testimony was not completely credible
and that there was insufficient evidence to support his
complaints of medication side effects was not contrary to the
weight of the medical evidence.

As to plaintiff's primary medical complaint of coronary
artery disease with angina, the ALJ detailed the evidence she
considered, from plaintiff's hospitalization and subsequent
angioplasty in November 1995 to his visit with Dr. Dahr in May
2003 and plaintiff's own testimony of his symptoms since that
time.  (Id. at 19-20)  After sending the entire medical record
and interrogatories to Dr. Rothkopf, the ALJ concurred with Dr.
Rothkopf's determination that there was a severe cardiac
impairment, but one which does not meet or equal in severity the
requirements of Appendix 1, Subpart P, Regulation No. 4.  (Id. at
20)

While plaintiff asserts that the ALJ erred in failing to
adequately consider all of the factors under 20 C.F.R. §

---

such that an individual suffering from side effects would have to
continue taking the medication.  (Id.)  While this argument
offers a plausible explanation as to why many of plaintiff's
medications were left unchanged, plaintiff's underlying argument
does not offer evidence that any side effects of his medications
caused a reduction in his ability to work.

404.1529(c)(3),[4] there is no evidence presented to suggest that
the ALJ's evaluation of plaintiff's complaints was not supported
by substantial evidence.  Under the current statutory regime, a
claimant's statements about pain and symptoms do not alone
establish disability.  42 U.S.C. § 423(d)(5)(A) (2004); 20 C.F.R.
§ 404.1529(c) (2004).  The ALJ specifically evaluated plaintiff's
complaints of pain, troublesome side effects from medication and
fatigue, and concluded that they lacked credibility insofar as
they were inconsistent with the conclusions of physicians and
plaintiff's own activities and testimony.  (D.I. 4 at 18-23)  See
20 C.F.R. 404.1529(c)(3) (2004).  Since the ALJ set forth a
"reasoned basis, grounded in the record, for concluding that

_____

[4]The regulations list the following as some of the factors
relevant to a claimant's symptoms which will be considered:
   (I) Your daily activities;
   (ii) The location, duration, frequency,
and intensity of your pain or other symptoms;
   (iii) Precipitating and aggravating
factors;
   (iv) The type, dosage, effectiveness,
and side effects of any medication you take
or have taken to alleviate your pain or other
symptoms;
   (v) Treatment, other than medication,
you receive or have received for relief of
your pain or other symptoms;
   (vi) Any measures you use or have used
to relieve your pain or other symptoms (e.g.,
lying flat on your back, standing for 15 to
20 minutes every hour, sleeping on a board,
etc.); and
   (vii) Other factors concerning your functional
limitations and restrictions due to pain or other
symptoms.
20 C.F.R. § 404.1529(c)(3).

plaintiff's complaints were not credible," her decision is supported by substantial evidence as required. <u>See</u> <u>Wimberly v.</u> <u>Barnhart</u>, 128 Fed. Appx. 861, 863 (3d Cir. Apr. 18, 2005); <u>see</u> <u>also</u> <u>Thompson v. Barnhart</u>, 281 F. Supp. 2d 770, 780-81 (E.D.Pa. 2003).  Indeed, like the ALJ, the court finds that objective medical evidence exists to clearly contradict plaintiff's alleged symptoms.

### D.   Opinion of Treating Physician

The ALJ may discount a treating physician's opinion where it is:  (1) not well-supported by medically accepted clinical and laboratory diagnostic techniques; or (2) inconsistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)(2003).  As interpreted by the Third Circuit, an ALJ may not reject a treating physician's opinion outright except on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.  <u>See</u> <u>Newhouse v. Heckler</u>, 753 F.2d 283, 286 (3d Cir. 1985).  In her decision, the ALJ referred to Dr. Baxter's opinion of December 3, 2001, which stated that "the claimant reported chest pain on heavy exertion and an episode of near syncope."  (D.I. 4 at 19) Plaintiff contends that the ALJ erred in failing to mention that Dr. Baxter also wrote that plaintiff's chest pain was consistent with angina pectoris; that plaintiff continues to have moderate

hypertension, that he has increased his Zestoric to twice a day and prescribed Ativan to reduce anxiety, and "I have recommended **no work** at present and that he restart cardiac rehab." (Id. at 21; citing D.I. 4 at 19, 143; emphasis in original)

While this evidence is helpful in providing a more complete view of Dr. Baxter's evaluation of plaintiff, Dr. Baxter's indications must be evaluated in the context of the rest of the record.  First, the paragraph of the ALJ's opinion from which plaintiff quotes is largely comprised of the complaints of plaintiff and various test data reflecting his condition, not the opinions of his treating physicians or others.[5]  (D.I. 4 at 19-20)  Thus, plaintiff's complaints of chest pain and near syncope are included there, while Dr. Baxter's opinion is not.

As the ALJ noted, plaintiff did not mention any emotional problems in his Social Security application, there were no claims by plaintiff that any psychological problem was disabling him, and no relevant testimony or observations were presented on these issues.  (Id. at 18-19)  Thus, this evidence of anxiety and treatment for anxiety could not be considered by the ALJ in his disability analysis, as anxiety was not part of plaintiff's disability claim.

---

[5]The only medical opinion contained in that paragraph is that of Dr. Kluck, plaintiff's treating cardiologist, who is quoted regarding his opinion as to the veracity of a medical test.

31

Additionally, Dr. Baxter's opinion must be evaluated in its full context.  Dr. Baxter wrote that plaintiff "continues to have moderate hypertension and chest pain **with heavy exertion** consistent with Angina Pectoris."  (Id. at 143) (emphasis added) In the same note, dated December 3, 2001, Dr. Baxter also recommended **no work** "at present" and that plaintiff restart cardiac rehabilitation.  (Id.)(emphasis in original)  There is no indication by Dr. Baxter as to a particular level of disability of plaintiff at the time he wrote this note, nor does he indicate that plaintiff should not return to work in the future.  In addition, Dr. Baxter did not offer an opinion as to plaintiff's ability to perform his particular occupation or whether that occupation involved heavy exertion.  Subsequent progress notes by Dr. Baxter through June 2002 also do not provide any assessment of plaintiff's ability to work at all or in a specific profession.  (D.I. 4 at 139-141)  Dr. Baxter did note that plaintiff was feeling better during subsequent appointments.  (Id. at 139-140)  On April 3, 2002, four months after Dr. Baxter made his recommendation, Dr. Kluck noted that plaintiff had "basically no complaints of a cardiac nature."  (Id. at 337) While the ALJ does not specifically reference this latter evidence, it is consistent with her determination and suggests that the ALJ's conclusion was not unsupported by substantial evidence.

32

As an additional consideration in evaluating a physician's opinion, the ALJ must consider whether the medical opinion relates to the physician's area of specialty under the regulations. 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) (2003). The ALJ clearly assessed the particular area of specialty of the medical experts whose opinions he evaluated.  The ALJ notes that Dr. Baxter is plaintiff's "treating board-certified family practitioner"; Dr. Damouni is "an internist"; Dr. Kluck is plaintiff's "treating cardiologist"; and Dr. Rothkopf is "a medical expert . . . who is a board-certified cardiologist and internist" (D.I. 4 at 18, 19, 20).  A direct weighing of evidence is presented by the ALJ in her conclusion, where she notes:

> Based upon the claimant's treadmill stress tests and daily activities, I see nothing to preclude performing the full range of sedentary work.  In September 2001, Dr. Baxter opined that the claimant should avoid emotional stress.  But in the same month, Dr. Kluck, his cardiologist, felt that he could return to work with full physical activities. In light of the claimant's extensive cardiac interventions, I will defer to the expertise of the medical expert Dr. Rothkopf and adopt his assessment.

(Id. at 21, internal citations omitted)  Indeed, it is not that Dr. Baxter's opinions were wholly disregarded - they were considered in light of his specialty but simply not afforded controlling weight.  This is consistent with the directive of the Third Circuit that even where a physician's opinion is not

33

considered to be controlling, it should still be treated as having "great weight, especially 'when [it] . . . reflects expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" <u>Morales v. Apfel</u>, 225 F.3d 310, 317-18 (3d Cir. 2000) (quoting <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999)); <u>see also</u> <u>Adorno v. Shalala</u>, 40 F.3d 43, 47 (3d Cir. 1994). The court holds that the ALJ was fully justified in placing greater weight on the opinions offered by medical expert Dr. Rothkopf than on the opinions made by plaintiff's family practitioner. Based upon this evidence, the court finds reasonable the ALJ's conclusion that plaintiff was not disabled such that he could not perform the full demand of sedentary work.

### E.   The Medical-Vocational Guidelines

At step five in the disability analysis, the evaluation of whether a claimant can perform other work may be based on the grids, which require the ALJ to take into consideration the claimant's age, educational level, previous work experience, and residual functional capacity. If the claimant suffers from significant nonexertional limitations, the ALJ must determine whether these nonexertional limitations place any further hindrance upon the claimant's ability to work. <u>See</u> 20 C.F.R. § 404.1569a(c)-(d). If they do not, the grids may still be used. If the claimant's nonexertional limitations are substantial, the

34

ALJ may use the grids as a "framework" only.  <u>See</u> 20 C.F.R. §
404, subst. P, app. 2, § 200(d)-(e).  In such a case, the
determination of whether the claimant can work is ordinarily made
with the assistance of a vocational expert.  <u>See</u> <u>Santise v.
Schweiker</u>, 676 F.2d 925, 935 (3d Cir. 1982).

A vocational expert is not required at a disability benefits
hearing and the use of one is wholly within the discretion of the
ALJ.  20 C.F.R. § 404.1566(e).  However, in <u>Burnam v. Schweiker</u>,
682 F.2d 456, 458 (3d Cir. 1982), the Third Circuit held that the
ALJ cannot meet the burden of establishing that other work exists
in significant numbers in the national economy by relying
exclusively on the Medical-Vocational grids when the claimant has
both exertional and non-exertional impairments.  Further, the
Third Circuit rejected reliance on the grids in such situations
because the medical-vocational grids do not "purport to establish
the existence of jobs for persons . . . with both exertional and
non-exertional impairments."  <u>Id.</u>

In April of 2002, Dr. Finch provided an assessment of
plaintiff's residual functional capacity and determined that
plaintiff remained capable of a range of medium work activity,
with a recommendation that plaintiff avoid concentrated exposure
to extreme cold.  (D.I. 4 at 351-358).  In August 2003, Dr.
Rothkopf offered his evaluation of plaintiff's ability to do work
and recommended sedentary work for plaintiff in a temperate

35

environment that did not involve a high degree of stress.  (Id. at 384-387).  The vocational expert testified that, if plaintiff were credible, there is no work he could perform.  (Id. at 55) Based on her view of the record as a whole and the opinion of Dr. Rothkopf in particular, the ALJ found that plaintiff is limited to sedentary work.  (Id. at 21)  As a result of finding that plaintiff can perform the demands of the full range of sedentary work, the ALJ determined that a finding of "not disabled" was directed by Medical-Vocational Rule 201.28.  (Id. at 22)

In her findings, the ALJ relies firmly (not merely as a framework) on the grids, though she does not specifically state that plaintiff is without nonexertional limitations.  However, in her evaluation of plaintiff's residual functional capacity, the ALJ notes, "He can **occasionally** climb stairs, balance, kneel, crouch, crawl, and stoop.  He should **avoid temperature extremes, noise, humidity, wetness, and high stress situations**."  (D.I. 4 at 22, 23)(emphasis added)  These findings reflect the presence of nonexertional limitations.  The regulations state that "environmental restrictions may cause limitations and restrictions which affect other work-related abilities."  20 C.F.R. § 4040.1545(d).  Specifically listed among the examples of nonexertional limitations in the regulations are: "difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes"; and "difficulty

36

performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." 20 C.F.R. § 404.1569a(c)(v, vi). If the ALJ contends that these findings do not reflect nonexertional limitations or that the limitations are either insubstantial or do not hinder plaintiff's ability to work, no such assertion is stated in the ALJ's discussion. Based on the presence of such nonexertional limitations, the ALJ's determination that plaintiff has the ability to perform the full range of sedentary work is placed in question. In order to substantiate the finding of non-disability and ensure that there are jobs available which plaintiff can perform, the ALJ should be required to cite examples of such occupations or jobs and provide a statement of the availability of such work. <u>See</u> Social Security Ruling 96-9p, 1996 WL 374185 (S.S.A. 1996).

The Third Circuit has held that the Commissioner "cannot determine that nonexertional impairments do not significantly erode occupational base under medical-vocational guidelines ('grids') without taking additional vocational evidence establishing that fact." <u>Sykes v. Apfel</u>, 228 F.3d 259, 261 (3d Cir. 2000). As the court in <u>Sykes</u> continued:

> Unless the Commissioner can cite to a Social Security Administration rulemaking specifically establishing the facts of an undiminished occupational base, the Commissioner cannot determine that a claimant's nonexertional impairments do not

37

> significantly erode his occupational base
> under the medical-vocational guidelines
> without either taking additional vocational
> evidence establishing as much or providing
> notice to the claimant of his intention to
> take official notice of this fact (and
> providing the claimant with an opportunity to
> counter the conclusion).

Id.  The ALJ at bar has relied solely on the grids to make her

determination without offering evidence to suggest that plaintiff

is without substantial nonexertional limitations.  Based on the

ALJ's findings, several nonexertional limitations upon

plaintiff's capacity are present; without vocational evidence or

a rulemaking to establish that these nonexertional limitations do

not diminish the occupational base, the ALJ cannot make the

determination that such a situation is present.  Thus, the ALJ's

findings regarding the presence and impact of nonexertional

limitations is not based on substantial evidence.  Consequently,

the ALJ has failed to show that plaintiff can perform other

available work in the national economy, pursuant to step five of

the disability analysis.  In order to ascertain whether there are

other jobs existing in significant numbers in the national

economy which plaintiff can perform, further proceedings are

required in this case.

## V. CONCLUSION

For the reasons stated above, the court finds that defendant

has not adequately supported and explained her findings in this

case.  Thus, the court shall remand the case to defendant for

further proceedings, consistent with this memorandum opinion.   An

appropriate order shall issue.